Good morning everyone. Welcome to the Fourth Circuit. We are prepared to hear arguments in four cases this morning. The first case is 12-2496, Yates v. Municipal Mortgage & Equity. And Mr. Brower, we are here for you. Good morning, Your Honors, and please the Court. My name is David Brower. I represent the appellants. I'd like to mention one thing before we start, which is essentially you have two different cases here and very different issues respecting those two different sides of the case. There are Securities Act claims and there are decisions made with respect to that, and there are Section 10b Exchange Act claims and decisions with respect to that, although the factual underpinnings of the claims on both sides of the case are the same. The standards applicable to the two different kinds of claims are very different. The Section 11 claims and 1282 claims are governed by Rule 8 and the standards governing Rule 12b-6, while the Exchange Act claims are governed by the PSLRA and the particularity rules of Federal Rule 9b. I say that at the outset because it's important to note the defendants did not challenge seriously below, and the Court so held, that material misrepresentations and omissions were made. The proof of the pudding of that is, of course, the Court did not dismiss every claim. It sustained the claims under Sections 11 and 12-2 with respect to people bought in the dividend reinvestment plan. With respect to exactly the same alleged omissions and misrepresentations that are alleged by both the Section 11-12-82 secondary public offering plaintiff, as well as the Exchange Act plaintiffs. Similarly, therefore, the questions of falsity and materiality are not before this Court. The defendants have not cross-appealed on those issues. In fact, they have not cross-appealed on any issue. Additionally, the Court below rejected defendants' argument that plaintiffs' Section 11 claims were barred by the one-year discovery rule under Section 13 of the Securities Act, and they have not cross-appealed. The Court below rejected defendants' argument that Mr. Dammeier could not trace his purchases to the secondary public offering prospectus. Again, no cross-appeal. Finally, the defendants argued that the Exchange Act plaintiffs had not adequately alleged loss causation below. Again, the District Court rejected that, and the defendants have not cross-appealed. The attempts in the brief to reopen these issues on appeal is improper and should not be considered. Nevertheless, we have, of course, responded to those issues in the brief, and I'm not going to cover them. That leaves three very important issues of law, pure of law, that are before this Court. The first is the proper reading and interpretation of Section 13 of the Statute of Limitations in the Securities Act of 1933. The second issue is whether or not the District Court erred in not considering a document that was expressly referenced and quoted in the complaint, but when the document was appended as part of the briefing on the motion to dismiss, the Court refused to consider it at all. And we believe, plaintiffs submit, and I think we've demonstrated that, drawing all inferences in favor of the plaintiffs, as one must under Rule 8, under 12b-6, that plaintiffs would have sustained the burden of showing Mr. Dammeier had in fact purchased, sufficient for the pleading state, had purchased, pursuant to the SPO and in the SPO, from one of the underwriters. What was the document that you're referring to? The document was his confirmation slip for the purchase of his newly made securities. And there was no dispute as to its authenticity. And, of course, the underwriter has the records of it, so if there was some dispute at all. Well, I thought the District Court judge did consider it. Did not. Hold on, hold on. Did consider it, but simply found it to be insufficient. No, Your Honor. What he found was, and I can quote from the paragraph, he refused to consider it. He recognized the parties had dispute over it. They were arguing what it meant. He said he won't consider it at all. So that's what he did. And I can find the section for you where he did that in the opinion. He actually said it twice in the opinion. So I know the underwriters say he considered it and went their way on it. The fact is he decided not to consider the arguments about it at all and not to consider the document at all. And, of course, it was a document incorporated by reference into the complaint and was appropriately before the court under the rules governing if the document is relied on in the complaint, the full document can come in on motion to dismiss. Additionally, the final issue, of course, is whether or not the District Court properly considered the Sienta standard. Let me start with Section 13. Section 13, plain language says, the statute of limitations runs three years after the shares are bona fide offered to the public. It does not say anything about registration statements. We pointed out that another section of the Securities Act of 1933 that was adopted at the same time in 1933 makes a very clear distinction between the date a registration statement becomes effective and the date a share is bona fide offered to the public. I believe we've demonstrated in the brief the plain words of the statute. Offer means the shares actually have to be offered. There's a definition of offered in the Securities Act, which is also cited in the brief. It means the security must be offered for value to someone. That did not happen here until February 3, 2007. That's the date the shares were actually sold to the public and therefore actually offered to the public. But haven't, I mean, the appellees have pointed to a number of cases, one in the Second Circuit that I recall that holds to the contrary, that the registration statement is the effective date of the offer. I must disagree with you. You're referring to the P. Stoltz case, which both sides have cited. What P. Stoltz did is, first of all, it's not a holding in P. Stoltz relating to the registration statement versus bona fide offer language. It's a discussion. It's dictated in the decision, but it's important there. And other courts have read it to be present. What they said was, the case made clear, quote, the registration is merely the manifestation of the underlying test, the genuineness of the offer to the public. The relevant question for Section 13 is, when was the stock really, truly, genuinely being offered to the public? That's the holding. And while there are a number of cases recited, most of them were in the Second Circuit, which is not unusual given it's a securities case. None of them deal with these facts. They all have unusual facts dealing with unusual securities. All of them, as we pointed out in the footnote, dealt with offerings that happened almost immediately after the registration statement went effective, which is commonly the practice, certainly in modern times. Not so much in 1933, before the technology existed, before the offerings were sold in advance and were sold overnight as soon as they went public and they had pops and things like that that we know of today. That's a technological issue. 1933, offerings often took several days or weeks to complete. What the most recent case from within the Second Circuit is the Lehman case, which is on the first page of our reply brief. And what the Lehman case says, dealing with this issue, let's see where I can find it, is, and I quote, To be sure, the phrase bona fide offer to the public recognizes that there will be circumstances in which stock covered by an effective registration statement has not genuinely been offered to the public, in which case the commencement of the repose period may begin later than the effective date of the registration statement. And the Lehman court, which was the case decided last year, 2012, the Lehman court then cites P. Stoltz for that proposition. And that is a holding with respect to an issue at hand here today. But why should this be that circumstance? What is it about this circumstance? Because they didn't sell the stock immediately upon the registration statement becoming effective. They started offering the stock on February 3rd. They backdated a prospective supplement. We're not arguing whether that's restarted. The statute of limitations has nothing to do with that. The defendants kind of have done this misdirection about prospective supplements and whether they restart the statute of limitations under a new SEC rule, I think it's 405B, has nothing to do with this. The issue is... Well, the point of that is that there are certain circumstances that have been recognized that restarts the clock, and this is not one of them. This is not one of them. This has nothing to do with restarting the clock. We can see that they're correct. We can see that it has nothing to do with the new regulation. The new regulation was implemented to deal with problems the SEC determined in shelf registrations where you register securities and then you drip them out over a period of months, years, and in order to keep people current, you have to give them a new prospectus or incorporate what typically happens is a new prospectus incorporates the most recent 10-K filings or 10-Q filings that have been filed  The situation here is simply there was a delay, a significant delay between the date the registration statement became effective and the date these people actually, genuinely offered shares to the public in exchange for value. Offer means to sell. It's a dictionary definition. There's no dispute as to what it means. What's happened is several courts, without much analysis, have kind of lighted upon this idea that the registration statement is a talisman. Well, it's not. The registration date is a talisman. It's not a symbol. It really is not. What the statute says is what it says. As we point out in the brief, if you look at the countervailing provisions in Section 4, when they wanted to time things against a registration statement, Congress knew how to do it. And they said it. And they said it in 1933. Well, I mean, it does have the benefit of being a fixed date. I suppose the same can be said of the date the stock is actually offered, in your view, sold to the public. You also argue that it really should be the last date that the shares are sold. And that would fluctuate depending on the circumstances. Well, the reason we said that, well, it would depend on the circumstances. The reason we suggest that, Your Honor, is to the extent it's not the initial bona fide offering date. If you notice, the SEC regulation that restarts the statute from supplemental prospectuses actually added the word initial. Which is not in the statute. So it's a narrower interpretation than the statute itself. The fact of the matter is offerings used to take place over a period of days, weeks, or months back in 1933, when telephones and telegraphs were all you had. And what would happen is, like this offering, where the offering was open on February 3rd, it closed on February 8th. So this was a fixed period offering. So to the extent you're saying, well, it could go on forever, in circumstances like this, which were common to fix the period of the offering, they fixed the period of the offering. And the reason we say last, and we don't need that to win, where if it's the first offering date, which was February 3rd, plaintiffs win. But if you think about it logically, if it's only the first offering date, which the statute doesn't say, it doesn't say when first bona fide offered, then the problem we have is they're punishing people who buy late in a fixed period offering to the benefit of people who buy early. And we find it illogical that Congress wanted to give greater protections to people buying the first day of an actual offering than people buying the last day of the offering pursuant to the same statement. All right. Mr. Brown, I understand that. I don't know how much time you have left. Yeah, let me go very quickly. On the 12A2 claim, I've discussed it. I don't think I have to go further. It was incorporated by reference. It's in the opinion. On rebuttal, I'll find the page in the appendix. The judge has said, I won't consider it. I hear you're arguing about it. I won't consider it. In fact, under the rules, he should have given us the win on that, because to the extent there's a debate over what it means, on the 12B6 motion under Rule 8, plaintiffs should succeed on that and go forward to discover. Lastly, let me deal with the Siamter argument. The problem with Siamter here is if you look through the court's opinion, you will see over and over again the court says defendants argue that. May I continue, Judge Dias? No, sir. Your time is up. You'll have to address that on rebuttal. Good morning, Judge Dias. Thank you. May it please the court. Yes, sir. Go ahead. My name is William Jay from Goodwin Proctor. As Mr. Brower said, there are a number of issues in this case, a number of defendants as well. So I'll speak for the Muni-May defendants on the 33 Act issues. Mr. Holland will speak for the Muni-May defendants on the 34 Act issues, and then Mr. Benro will speak for the underwriters on the two issues that they've briefed separately. So I'll begin with the 33 Act issues. The plaintiff's position that offering requires a price term would be inconsistent with the text, the purpose, the structure, and the SEC's settled understanding of the 33 Act. I think that something Mr. Brower said in the top side of the argument is very significant. He says that offering means to sell. Under the definition of offering in the 33 Act, offering does not mean to sell. It's much broader than that. That's Section 2A.3 of the 33 Act. It's reproduced in a footnote on page 22 of our brief, the thicker of the two red briefs. And it includes, for example, solicitation of offers to buy. It's much broader than the common law definition of offer for contract law purposes. And Judge Friendly's opinion for the Second Circuit in the Diskin case I think makes this very clear and also helps to illustrate why accepting Mr. Brower's argument would weaken the regulatory enforcement structure of the statute. An offer includes things that do not have price terms in them, precisely because the Securities Act imposes requirements on offers, and it wants to capture things that do not have price terms in them. So, for example, in the Diskin case, the underwriter had proposed that the customer buy securities when, as, and if offered. That's much more inchoate than anything you can say about the registered secondary public offering in this case. But that's still an offer because of the definition that's in the Act. Well, why can't those terms coexist together for purposes of the statute of oppose? You could have a different rule. That's what the plaintiffs or the appellants are asking. Well, I don't think so, Your Honor. I think the plaintiffs are saying that offer has to have the same meaning throughout the Act. And, indeed, because it's a defined term in the definitional section of the Act, it does have to have the same meaning. They're trying to draw support from Section 4 and saying that Section 4 illustrates the meaning of offer in Section 13. Now, we don't think that that gets them home because in order for them to win, they have to establish that the effective date of the registration statement is never the same thing as the bona fide offer date if there's no price term. Section 4 doesn't illustrate that. All Section 4 illustrates is that sometimes the bona fide offer date is not the same thing as the effective date. And we think the simplest explanation for that is that often offers may be made before the effective date. The effective date is when securities may lawfully be sold, but offers may be made before then. Are you conflating the two terms under Section 4, the two dates? The two dates under Section 4? We're saying, Your Honor, that they can be the same or they can be different. And I think the fact that Section 4 puts them in different, spells them out separately, illustrates that Section 4, which imposes a requirement to send a prospectus during a period of time, Section 4 wants to capture any which way that it can, that these situations can arise. But it wants to capture the period before the effective date of the registration statement. If those securities are bona fide offered before then, you're allowed to have an offering before the effective date. You just aren't allowed to sell them in the ordinary course. That's the core prohibition. So we think that the statutory definition is key, and we think that the fact that this understanding is shared by every court is significant, and also by the SEC. But no court has said that that's the case in the context of the application of the statute of repose. Well, every court that has examined the statute of repose has agreed that, at the latest, the effective date of the registration statement starts the repose clock running. And I think if you read the next four sentences of the Lehman Brothers decision, which Mr. Brower alluded to, after the portion that he quoted to you, you'll see that's the holding. The holding of Lehman Brothers is that those claims were untimely. Why were they untimely? Because they were brought more than three years after the effective date of the registration statement. There was no allegation in that case that some unusual circumstance had made the effective date of the registration statement an inappropriate measure. And there's no allegation in this case. Right. How much time had elapsed in that case between the date of the statement and the offer? I don't have that. Does it matter? I mean, at some point, doesn't it become inequitable to throw a plaintiff out of court if there's a significant delay between those two dates? Well, I think, Your Honor, that the – two points on that. This is the first offering versus last offering. First point of the offering, last point of the offering, the point that the Second Circuit addressed in P. Stoltz. The SEC in that case said it has to be the first part for two reasons. Number one, there would be no proposed period at all for unregistered securities otherwise. And number two, it would render superfluous a key provision of the Investment Company Act, which Congress adopted basically to cure this problem for the Investment Company Act. Section 11 liability is extremely broad, and, you know, the plaintiffs are asking for strict liability. That is tempered in the Securities Act by the proposed period and the statute of limitations. The statute of limitations looks to what plaintiffs knew and when they knew it. The proposed period looks to, as this Court said in the Kavanaugh case, a fixed date readily determinable by the defendant. We submit that that here at the latest is the effective date of the registration statement. Well, the sale date is also a fixed date. Well, I'm glad you brought that up, Your Honor, because if you look at Section 13, it actually draws a contrast between the sale date. That's when the proposed period begins for Section 12A2 claims and the first bona fide offering date. That's when the proposed period begins for Section 11 claims and Section 12A1 claims. We think that's very significant. You know, if a plaintiff is time barred on his Section 11 claim, he may well, if he's one of the proper plaintiffs, be able to bring a Section 12A2 claim because the proposed period is different. Now, in this case, the plaintiff is time barred on both and does not have standing to bring a Section 12A2 claim. You want to talk about Sanger? Mr. Holland will talk about Sanger. I wonder if I might say one word about the slip. Mr. J., your time is up. Thank you, Your Honor. Mr. Holland? Good morning. May it please the Court, I'm here to talk about Sanger. But before I do so, I want to clarify one thing Mr. Brower said at the opening of his argument. He said that the defendants concede the material the statements were made. We do not concede that. All that happened was on the motion to dismiss, we did not argue that the complaint did not allege material misrepresentation. We don't concede that it happened for all time. Turning to Sanger, the plaintiff's theory of Sanger has shifted somewhat during this case. Their latest theory is reflected on page 15 of their reply brief, is that, quote, by mid-2006, close quote, Munime executives concluded that they would have to consolidate all of these low-income housing funds onto their balance sheet, but concealed, knew but concealed, that there would be significant time and costs involved in doing so. Now under the PSLRA, in order to sustain that theory, the plaintiffs have to allege particularized facts that give rise to a powerful, cogent, and compelling inference of fraud. That's the tell-all case. And the complaint here does not allege particularized facts that will support plaintiffs' latest theory. Their strongest evidence are the three confidential witnesses that are referred to beginning on paragraph 80 of the complaint. But those confidential witnesses don't support the theory that Munime knew but concealed the enormous cost of this project beginning in 2006. One confidential witness, confidential witness three, left in early 2006 before Munime executives allegedly reached the conclusion that they needed to do a full consolidation. And there's no discussion in the summary of confidential witness three's allegations of cost. There's no mention of cost whatsoever. Confidential witness one was an administrative assistant who said that during the relevant period she attended many, many meetings at which the application of BIN 46-R was discussed. But again, nothing in her allegations, which are paragraphs 80 and 81 of the complaint, make any mention of cost, let alone the concealment cost. So plaintiffs are really just left with one witness for this new theory, and that's confidential witness two. And if you read the allegations that are attributed to confidential witness two, he was in the audit department, and he says that by mid-2006, which is shortly before Munime did announce the second restatement and pulled all their financials for the second time in a year, that senior accounting personnel, the CFO and others, had concluded that Munime needed to do a more or less full consolidation of all these funds on a financial statement. But that's all confidential witness two says. If you read the complaint, he doesn't say anything at all about cost. The complaint in the next paragraph, paragraph 85, which appears in the joint appendix on page 83, does talk about cost. But paragraph 85 is not attributed to confidential witness two. It's just sort of snuck in there. But every other paragraph in that section says confidential witness X said. Paragraph 85 doesn't. What paragraph 85 says is that the senior executives of Munime, the CEL, Mr. Falcone, and the CFO, were heavily involved in both restatements. And as a result of that heavy, heavy involvement, which is to be expected, that they knew or they should have known about the extensive costs that this process would involve. But that's just an inference the plaintiffs draw. There's no confidential witness that says they knew about the cost, they discussed the cost, they concealed the cost. And there's no other document referenced in the complaint which says anything about the defendants knowing about or concealing the cost. What about the contention that by 2006, the former CFO, Ms. Lundquist, had some inkling that the financial accounting was incorrect or wrong? That was not disclosed. Well, the point is not that the compliance with FIN 46-R was wrong. It was wrong and they knew it would cost a lot of money, to correct it, and that's what they failed to disclose. But what happened is Ms. Lundquist came in in early 2006, Mr. Harrison left at the end of 2005. Fresh eyes, Ms. Lundquist looked at this very complicated issue, and it was especially complicated for a company like Munime, and concluded by mid-2006, as the complaint alleges, that they did need to consolidate all of these funds on its balance sheet. And what happened shortly afterwards, within a couple of months of that, Munime pulled all its financials, and announced it was going to undergo a second restatement. So that's hardly compelling evidence of scienter. What it shows is that Ms. Lundquist came in, she learned about the company, she knew about FIN 46-R, it was obviously an issue with the company, because of course the company had consolidated over $1.3 billion of funds on its balance sheet in 2004, and told its investors, yes, we're consolidating $1.3 billion, but we're not consolidating another $900 million, because we don't think it meets the requirements of FIN 46-R. Go ahead, I'm sorry. So it's your contention that CW2's statement about Falcone and Lundquist, that they hid restatement costs from the public for at least six months, is that specific enough, or is it just conclusory? It's conclusory, because Confidential Witness 2 is not saying that. Confidential Witness 2 isn't saying anything about hiding costs. Confidential Witness 2 doesn't say anything about costs. If you read those paragraphs attributed to them, it's only paragraph 85 that talks about the costs, and you'll look at paragraph 85 and there's no mention of Confidential Witness 2. So that's not what any Confidential Witness was saying. And I would point out something else here. Going back to the fact that they did consolidate $1.3 billion worth net of funds onto their balance sheet in 2004, when they did that, they didn't incur any significant delays. It wasn't a huge process, and they didn't spend tens of millions of dollars doing it. It was, relatively speaking, fairly easy. So when they concluded in the middle of 2006 that they would have to consolidate more funds with about $900 million of net assets, they had no reason, no premonition that consolidation of these additional funds would cause the enormous delays and cost the enormous amount of money that it eventually did. I think part of the problem was because they had to review ten quarters worth of statements when they began this process, perhaps they didn't anticipate that the effort would be enormous. But it really wasn't until the spring of 2007, when they brought in yet another consulting company called Navigant. And Navigant had 72 full-time equivalent employees working on this over the summer of 2007 that they really began to realize the enormity of the cost. And at that point, they began to disclose that to their investors. In July and August, they couldn't issue financials, but they did issue press releases saying, you know, we've hired Navigant, we have a lot of people working on it. And then in November, as the bill started to roll in, in November of 2007, they started to provide more detailed information. Part of the appellant's contention, as I understand it, is that there were these disclosures, but it was kind of a drip, drip, drip kind of set of disclosures in the context of very rosy assessments of the company's future. What are we supposed to make of that? I don't think there were rosy assessments of the company's future. I think that the drip, drip, drip was because this was a problem which just kept getting bigger and more expensive. And as it did so, they disclosed it. Well, that's one inference, but they have another one. But there's no confidential witness that says that they knew and concealed it before they did disclose it. All right. Thank you. Thank you, Mr. Holland. Mr. Mender? Thank you, Judge Diaz. May it please the court, I'm Jason Mender, and I'm here today on behalf of the underwriter defendants Merrill Lynch and RBC Capital Markets. Now, the underwriter defendants have adopted the arguments of the other defendants in the briefing. We likewise adopt the arguments they presented here today, but I would like to just point out two arguments that are specific to the underwriter defendants. First, Judge Garb has correctly dismissed the Section 12 claims against the underwriter defendants because the plaintiffs failed to plead that either one of them was an immediate seller, as is required under Pinter v. Dahl and its progeny. On appeal, the plaintiffs don't even attempt to argue that any of them purchased shares directly from Merrill Lynch, so there's no serious dispute that the Section 12 claims against Merrill Lynch were properly dismissed. They raise one argument with regard to RBC. They contend that underwriters in a firm commitment offering like this one actually are the title owners of the shares that they sell to the public. And while that's true, the plaintiffs nevertheless failed to plead that any of them purchased shares directly from RBC Capital Markets. In response to that defect, the plaintiffs seem to be arguing that the district court should have inferred from a trade confirmation slip that was merely mentioned in the complaint that one plaintiff, Charles Dammeier, purchased shares directly and immediately from RBC Capital Markets because the trade confirmation slip contains a logo in the upper left-hand corner. And if the court looks to page 1606 of the joint appendix, it will see that trade confirmation slip, and indeed it will see the letters RBC are on the logo, but it will see something else that the plaintiffs failed to mention, which is that the logo does not belong to RBC Capital Markets, which is the defendant in this case and the underwriter in this case. Rather, the logo belongs to RBC Dan Roucher. That fact is just absent from the plaintiff's brief. But how do we know that? How is that clear from the record? I would respectfully submit that the plaintiffs should have made an allegation in their complaint about who it is that they purchased from. The fact that they didn't is sufficient enough to affirm dismissal. But if the court is going to entertain the confirmation slip, it will find it on page 1606 of the joint appendix. And the logo is plain as day. It says RBC Dan Roucher. The word Dan in all 200 pages of the complaint appears not even once. There's not a single allegation about RBC Dan Roucher. So read in its entirety, the logo does not support plaintiffs' assertion that any defendant purchased shares immediately from an underwriter who owned title to them.  They don't allege that it was an underwriter. In fact, they allege that RBC Capital Markets was the underwriter. They don't allege alternatively that RBC Dan Roucher directly solicited any purchases from Mr. Dammeier. And they don't allege that RBC Dan Roucher and RBC Capital Markets were the same company at the time of the offering, and indeed they were not. Now, I do want to be clear that today as I stand here, they are the same company. Three years after this transaction, RBC Dan Roucher and RBC Capital Markets merged. But that's irrelevant to this appeal. Because the plaintiffs have not pleaded that RBC Dan Roucher could have any Section 12 liability, they certainly have not pleaded that that liability could have been passed along to any other company. So the bottom line is that the plaintiffs have given up any argument that Merrill Lynch could be an immediate seller, and their reliance only on appeal on the notation RBC and the logo of this confirmation slip does not allege or make plausible any assertion that Mr. Dammeier purchased any offering shares directly from an underwriter. The second point that I'll make just briefly is that in addition to the fact that plaintiffs' Section 11 claims are time-barred under the three-year statute of repose, as Mr. Gage has suggested, both the 11 and 12 claims are also barred under the one-year statute of limitations. And let me just briefly respond to a point that Mr. Brower made. Mr. Brower suggested we were required to cross-appeal. I submit that it's a criminal precept of appellate procedure that we cannot cross-appeal to seek affirmance. The Section 11 and Section 12 claims were dismissed. We want affirmance, and we can't cross-appeal for that result. We simply take issue with the district court's reasoning about the one-year statute of limitations, at least as regards to the underwriters. The reason why the statute of limitations rang is that the plaintiffs allege only one misstatement with regard to the offering documents themselves, and that's that Muni May did not consolidate these tax credit funds in its financial statements. But that issue was disclosed to the market more than a year before the plaintiffs filed their complaint in this case. Indeed, on January 31st of 2007, Muni May clearly disclosed that it was going to be required to consolidate substantially all of the funds that it hadn't consolidated before, and that was sufficient for sure to put the plaintiffs on notice of the only misstatement that they alleged about the offering documents. Now, there were posts that the market was still learning other things about the scope and extent of the restatement, and that officials at Muni May learned about the scope of the restatement in 2006 is irrelevant to the underwriters because liability for the underwriters begins and ends with the offering documents, and everything that they alleged that was wrong about the offering documents was disclosed more than a year before they filed their first complaint. So in conclusion, the district court was correct to dismiss the underwriters for failure to plead that they were immediate sellers and for the reasons that Mr. Jay discussed. All right, sir. Thank you. Mr. Brown. Please, the court. As promised, it's at the joint appendix, page 1723, where Judge Garbus ruled, the court will not consider the parties' respective arguments regarding the confirmation's significance or lack thereof. But didn't he drop a footnote almost a page long? He has a footnote. It wouldn't have mattered if he had considered it. It says, confirmation notice shows that Dan Meyer purchased 600 shares on the 3rd. I'm not going to read it. Yes, there's a thing. What he does is he sets forth both sides' arguments about the confirmation slip to kind of memorialize it, but he refused to resolve it because he decided he wouldn't consider it at all. We believe he should have considered it, and on a 12 v. 6 motion, should have drawn all inferences in favor of the plaintiff on that issue. What you just heard from Merrill Lynch, from the underwriters' counsel, is he would like to argue what that means. And as Your Honor, Judge Anderson said, how do I know that? Well, you know it because he just said so. And that's the only basis in the record or in the complaint for what the confirmation means and whether or not it shows, at least for purposes of pleading under 8A, that Mr. Dan Meyer did, in fact, purchase shares from RBC in the secondary public offer. And because he says so, it brings us to the scienter issue. The problem with Judge Garbus' opinion, not the things he found for us, and I disagree on the cross-appeal, he rejected the one-year statute of limitations. They needed to raise that error if they want to raise it now, and they didn't do that. But the problem with the scienter allegations is that Judge Garbus took the allegations in the complaint, which we've abandoned none, they're all the same allegations. If you look at the summary in the judge's opinion, if you look at the summary in our briefs, they're all the same misrepresentations and omissions all along. While, you know, we emphasize one thing or another this time around, it doesn't change what the allegations were and which were sustained with respect to the dividend reinvestment investors under Section 11 and 12-2. What he did was he looked at our allegations as to what plaintiffs say the defendants knew or didn't know, and then he took the defendants' arguments from their brief and treated them like they were a pleading or facts that he could accept as true. And then he balanced them. And the problem is he wasn't permitted to do that. Under TELEBS, it's expressed. Whatever countervailing factual inferences a court may draw in weighing scienter, they have to be facts based on the four corners of the complaint, not on any creative thing that a defendant can argue to a court or, for that matter, the court can imagine for itself. Well, I didn't hear the appellees arguing from their brief. They went through the three confidential witnesses and affidavits and pointed out the deficiencies, which would lead, they say, to a reasonable inference that there was no intent to draw. Well, here's what Mr. Holland just said. They had no reason to believe that this would be so expensive, blah, blah, blah. No facts to support that. That's Mr. Holland's argument. Maybe that's his defense in the litigation. No facts in the complaint to sustain what they did believe. Made-up facts. It wasn't until 2007 when they realized the enormity of the cost. No facts to support that. The complaint alleges the opposite, that they knew by mid-2006 exactly how horribly expensive this would be. In fact, Mr. Holland just said they knew it would be really expensive. He conceded that just now during his argument. The district court found that they blunted the statements they did make with positive statements that made whatever disclosures they made with respect to what they were doing, which didn't include the cost. It didn't even mention FIN 46 or why they were doing the restatement. It didn't mention what the issues were involved in the restatement. It didn't mention that they had to consolidate all 200, that they were talking about dozens and dozens and dozens of financial statements over a period of many, many years, what the task would entail. Instead, you have Judge Garvis finding, it's just as credible that Ms. Lindquist believed the accounting was okay because she was satisfied with something Price Waterhouse told her. And therefore, I find that more compelling. No facts to support that. And the confidential source expressly said Price Waterhouse and management were at each other's throats over which of these to consolidate. Management didn't want to consolidate and wanted to consolidate as few as possible. Price Waterhouse was telling them they had to consolidate all of them. And the result was they fired their big eight accounting firm. What happens next? They hire another big eight accounting firm, and suddenly they have to— Why doesn't that lead to the inference that there was an honest disagreement as to the extent of the need for consolidation? Because to the extent they want to say this was so complicated, another fact that the defendants just added, and that they were overwhelmed, another fact the defendants made up. Nothing in the complaint to support these facts. The court instead accepted their arguments as fact and then weighed them against the facts alleged in the complaint. And you're not allowed to do that under telehealth. Yes, you're allowed to consider countervailing inferences, but not ones of your own making. They have to be things that you would see in the complaint.  The answer is that would be the excuse in every single case. Management thought it was okay. But here we have confidential sources saying what they knew. Additionally, Your Honor, we point the court to Litwin v. Blackstone Group. It's a case cited both in our opening brief. It deals with the obligation to affirmatively disclose material information where an issuer believes it's facing an issue that, if it comes to fruition, is likely to have a material adverse impact on the company's operations or financial statements. And it requires you give detail as to what those issues are and what the risks involved are. And that case is decided under SEC Regulation 303. There's a long discussion in the Blackstone case of it. They have an affirmative obligation to make these disclosures as to what was involved in these restatements when they determined, as the court found in mid-2006, that they believed they had to consolidate all the Vs. Finally, I want to answer Judge Diaz's question about the Lehman Brothers case. The answer is on page 9 of the Lexis printout, it is undisputed that the registration statement for these securities became effective on May 18th, May 18th, and May 20th, respectively. The plaintiff does not allege that the securities that registered were not genuinely available on those dates. The repose period for that, therefore, began the effective date of the registration statement. The answer is the shares were sold immediately upon the effective date. It's a modern offering of a huge public company. Thank you, Your Honor. Thank you, Mr. Brough. All right, thank you for your arguments, counsel. We'll come down and brief counsel.
judges: Albert Diaz, Henry F. Floyd, Joseph F. Anderson, Jr.